503 P.2d 850

**SALT LAKE CITY, a municipal corporation, Plaintiff and Appellant,**

**v.**

**UNITED PARK CITY MINES COMPANY, a corporation, Defendant and Respondent.**

**No. 11948.**

Supreme Court of Utah.

Nov. 22, 1972.

Henriod, J., dissented and filed opinion.

Callister, C. J., concurred in result and also concurred in dissent of Henriod, J.

Joseph Novak, Jack L. Crellin, Salt Lake City Atty., Salt Lake City, for plaintiff and appellant.

VanCott, Bagley, Cornwall & McCarthy, Clifford L. Ashton, Charles L. Maak, Salt Lake City, for defendant and respondent.

ELLETT, Justice:

This is an appeal by the City from an adverse ruling by the lower court sitting without a jury. The defendant, hereafter called the Mine, constructed an adit referred to as the Spiro Tunnel into the mountain and obtained a large flow of water. The City claims that the flow of water down Big Cottonwood Creek was diminished by the diversion through the adit. The City owns most of the flow of this creek.

At the commencement of trial the court determined that the following issues were to be tried:

1. Has there been an unnatural loss in the flow of Big Cottonwood Creek?

2. If so, what is the causal connection, if any, between this loss and the flow of water from the Spiro Tunnel and its connected underground workings?[1]

3. If there is a causal connection, is the City entitled to a decree quieting title to any part of such water, and, if so, how much?

Big Cottonwood Creek is approximately twelve miles in length and runs from the summit in a westerly direction to the valley below, draining an area of 50.54 square miles of mountain terrain. The water flowing down this creek has been measured since 1899 by means of various measuring devices near the mouth of the canyon.

Across the divide from the Big Cottonwood drainage area and extending easterly therefrom into another valley is the Thaynes Canyon drainage area consisting of 3.74 square miles. It was under this area that the defendant caused to be constructed its tunnel which with its ramifications extends from the portal a distance of 21,000 feet and approximately 1800 feet below the surface of the divide between the two drainage areas. The flow from this tunnel now averages 5.5 c. f. s.[2] but has discharged as much as 23 c. f. s.

The files and transcript in this case consist of more than three thousand pages, and in addition thereto there were 176 exhibits prepared and introduced into evidence for the consideration of the court. The court made and entered 156 pages of findings and prepared a memorandum decision of 143 pages plus a 20-page appendix.

The City offered proof of the correlation between the reduced flow of Big Cottonwood Creek as compared with the normal flow of other streams. It also gave

1. Water intercepted in the first 6600 feet was excluded by agreement of the parties.

2. Cubic feet per second.

comparisons of the runoff of Big Cottonwood Creek with the precipitation over the years. It offered evidence to the effect that as the flow from the tunnel increased, the flow from the creek diminished. It offered no evidence that any particular spring or stream dried up. The experts for the City testified that in their opinion approximately 90 percent of the water flowing out of the Spiro Tunnel would have entered Big Cottonwood Creek had it not been intercepted.

In the Findings of Fact the court in speaking of the expert witnesses for the City said:

> Professor Ray Marsell has few, if any, peers on knowing the geology of the Wasatch Mountains. . . . The long and practical experience of John Ward in water flow problems is probably unequalled by anyone in the area. . . .
>
> *   *   *   *   *   *
>
> John Ward, who certainly qualifies as an expert in this field, expressed the opinion that there has been an unnatural decrease of between 12–15 cfs. at the mouth of Big Cottonwood Creek . . ., expressed the opinion that 90% of Spiro flow is Big Cottonwood water, . . .

Professor Marsell, who likewise clearly qualifies as an expert in his field, expressed the opinion that 90% of the water coming out of the 143 drift has its

origin in the ground water reservoir which, if not intercepted by the drift, would have had an opportunity to contribute to the flow in Big Cottonwood, as would waters from the 137 cross cut north of the Crescent fault and that pumped from the West End Shaft. Professor Marsell's "leaky barrel" concept as the source of waters of Spiro Tunnel flow has more basis in logic and reason than does the "deep flow from the east" concept testified to by defendant's witnesses.

The 143 drift, 137 cross cut, and West End Shaft referred to above are the main sources of the Spiro Tunnel flow.

Had the court based his ruling upon the evidence before him, we do not know what the judgment might have been. However, instead of confining himself to the testimony and exhibits given in evidence, he used a book not in evidence, by the use of which he made for his own consideration nine exhibits which were never seen by counsel at trial, and then by the use of a computer at the University of Utah, operated by a student whose skill in programming was, and is, unknown, arrived at what he called a "proper slope" which he says is at variance with that used by the City in calculating the base line of a double mass curve used to compare variance in comparative stream flows.

The computer gave the judge a slope not in accord with the evidence given by the

experts; yet he used this slope to decide that the exhibits of the City were in error and, therefore, the City had not sustained its burden of showing an unnatural decrease in the flow of the waters of Big Cottonwood Creek since the driving of the Spiro Tunnel. By making this determination, the court did not feel required to consider the other issues reserved for trial.

■ In deciding a case tried without the aid of a jury, the court has great leeway in deciding what are the facts as presented by the evidence before him. However, neither a judge nor a jury is permitted to go outside the evidence to make a finding.[3]

■ The law is aptly stated in the case of In re Hocking's Estate:[4]

. . . It is elementary that in matters outside of the field of general knowledge and in cases where the testimony of experts or those particularly familiar with matters at issue is necessary, the findings of all triers of fact, either court or jury, must be based upon testimony of witnesses or other evidence made a part of the record. . . .

■ In view of the fact that we have found it necessary to reverse the findings and judgment because of impropriety of the methods used as discussed herein, we can appreciate that the appellant City, as the losing party who was obliged to take this appeal and obtain the reversal, may have apprehensions about a fair and impartial determination if the case were simply remanded for further consideration. In view of the desirability that in this important litigation there be such a fair and impartial trial with the most complete objectivity obtainable, we deem it appropriate to make the order that the case be remanded with directions that a new trial be had upon all of the issues. No costs are awarded.

TUCKETT and CROCKETT, JJ., concur.

CALLISTER, C. J., concurs in result of ELLETT, J., and also concurs in observations of HENRIOD, J., in his dissent.

HENRIOD, Justice (dissenting).

I dissent. The main opinion is not bottomed on the evidence in the record. It recites a very small portion thereof favorable to appellant, then says that because the trial court made an independent research and some charts, aided by his son who had access to a computer, there was reversible error. This is an equity case in which we examine the evidence in, not outside of the record. Use of such extrinsic evidence by the trial court may be error of some sort but is not ipso facto reversible

---

3. Provo River Water Users' Ass'n v. Carlson, 103 Utah 93, 133 P.2d 777 (1943).

4. 3 Wis.2d 79, 87 N.W.2d 811, 817 (1958).

error. I take it that even erroneous findings ipso facto would not constitute such error.

We have said that if believable evidence preponderates in favor of a party, he should enjoy the benefits of the judgment, albeit a wrong reason has been assigned therefor. This rule should apply irrespective of the trial court's independent homework after the parties have rested. Such extracurriculum research should be ignored, if, but for such work, the evidence demands the same judgment.

The thrust of the main opinion seems to be that error is committed as soon as the trial judge indulged in book reading or research dehors the record, irrespective of the weight, credibility and sufficiency extant up to the time the case is closed. Anything else would seem to be surplusage and not dispositive according to the rules of review in equity cases.[1] In other words I think the only dispositive approach here is to read the record first. If a preponderance of the evidence supports the judgment, we shouldn't bother to consider the reason for the judgment.

It appears to me that we have the cart before the horse in concluding that the trial court erred in considering something outside the record and in forgetting that having the same obligation to examine the same evidence that he has to examine, we now prove ourselves guilty of the same sin by ourselves going outside of the record and reviewing the same evidence that we say convicted him, but acquits us.

The only justification for our decision here is insufficiency of the evidence reflected in the record at the time the parties rested. This is not assigned as the basis for the main opinion. It is bottomed on something dehors the trial, which we say was error if the trial court, indulging that course, presumes to base his decision thereon,—but not error if we indulge that course under identical circumstances. This would appear to be something akin to saying our reasoning is quite a palatable potion, but that of the trial court is peptic poison.

I suggest as guidelines to the next judge who will be faced with another 3000 pages, more or less, that his post-trial reading habits be confined to poetry, that he employ his spare time preparing Gallup polls, use a ball point pen rather than a computer, and by all means, never speak to his son again.

1. Stanley v. Stanley, 97 Utah 520, 94 P.2d 465 (1939).